UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| MYRA L. FREEMAN, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09CV47 CDP |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Myra L. Freeman's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. Claimant Freeman brings this action asserting that she was disabled because of neck and back problems coupled with anxiety and depression stemming from an injury she sustained when stepping off of a malfunctioning elevator. The Administrative Law Judge concluded that Freeman is not disabled. Freeman appeals the decision denying her benefits. Because I conclude that the ALJ's decision is supported by substantial evidence, I will affirm the decision.

**Procedural History**

On December 20, 2005, Myra L. Freeman filed an application for a Period of Disability and Disability Insurance Benefits. Freeman alleged disability beginning November 30, 2004. The Social Security Administration initially denied Freeman's application on March 3, 2006. Thereafter, Freeman filed a timely appeal and a request for hearing on April 4, 2006. Freeman appeared and testified at a hearing held on May 2, 2007. On June 18, 2007, The ALJ issued an opinion upholding the denial of benefits. The Appeals Council of the Social Security Administration then denied Freeman's request for review on November 14, 2008. The ALJ's decision thus stands as the final determination of the Commissioner. Freeman filed his appeal on January 8, 2009.

**Evidence before the ALJ**

In November 2000, Freeman injured herself when she stepped off an elevator. The elevator car did not rise to the level of the floor and she tripped, fell onto her side and twisted her neck when she rammed her head into the far wall. Since her accident, Freeman has been in and out of medical care up to the date of her hearing.

In a report completed on January 6, 2006, Freeman indicated that she is sometimes able to go for a walk of up to a mile or two, but that she has difficulty with hygiene due to pain, especially with hair and make-up. The report also

indicated that Freeman is able to drive, do light household chores, microwave food, shop for groceries, pay bills, visit people, and play cards.  Freeman tries not to lift over 10 pounds and cannot sit for very long, making driving difficult.  Freeman indicated that she does not handle stress well, but is good at following instructions, getting along with authority figures, and handling changes in her routine.  In a Pain Questionnaire, Freeman indicated that she has intense pain in her neck, shoulders, arms, and lower back on a daily basis.

At the time of her hearing in May 2007, Freeman was working one day a week for 5 hours as a bartender.  Before that, Freeman had previously worked as a secretary and receptionist at several law firms.

**Medical Records**

In the week following the November 2000 accident, Freeman was treated at St. Mary's Health Center by Gary Gray, M.D.  Dr. Gray gave her permission to return to work seven days after the fall with instructions to take frequent breaks.  Freeman saw Cheryl Faber, M.D. on November 15, 2000 with complaints of headaches and neck pain.  Freeman was given a prescription for physical therapy and referred to Paul Young, M.D.  She had continued complaints of head and neck pain combined with tightness and immobility of her right shoulder and arm.  On February 26, 2001, Dr. Young advised Freeman to cut back on her smoking and recommended conservative treatment of anti-inflammatory medication and muscle

relaxants.

In August 2001, the claimant was evaluated by Frank Petkovich, M.D., an orthopedic surgeon. Dr. Petkovich saw the claimant for an independent evaluation of her neck pain and the shooting pain in her upper left extremity. Dr. Petkovich recommended a more aggressive physical therapy program. After the results of an October 22, 2001 cervical myelogram from Missouri Baptist revealed disk herniations at C5-C6 and C6-C7, Dr. Petkovich recommended Freeman be scheduled for an anterior cervical discectomy and interbody fusion.

On December 20, 2001, Freeman underwent surgery at Missouri Baptist Medical Center for a C5-6, C6-7 partial vertebrectomy, C5-6, C6-7 microdissection, C5-6, C6-7 anterior cervical fusion, and a C5-6, C6-7 anterior cervical plating and preparation of structural allograft.

Six months following her surgery, Freeman was treated by John D. Graham, M.D. at the Pain Treatment Center. From May 2002 to June 2002, Dr. Graham recommended trigger point injections. On June 17, 2002 Dr. Graham noted that physical therapy had reported significant improvements and that Freeman's range of motion was very close to normal. Dr. Graham opined that she had reached maximum medical improvement. Dr. Graham did not see the claimant again until July 2004.

Freeman continued under the care of Dr. Kennedy, who saw her on a

monthly basis. Dr. Kennedy released her for work on July 29, 2002 with no lifting over 10 pounds. However, at that time Dr. Kennedy also noted an incomplete fusion at C5-6. On August 28, 2002 Freeman started on home cervical traction. In October 2002, Dr. Kennedy recommended surgery for a posterior fusion.

On December 3, 2002 Freeman underwent surgery at Missouri Baptist Medical Center for cervical pseudoarthrosis, bilateral foraminotomies, microdissection, posterior cervical fusion, and segmental instrumentation and harvesting and preparation of structural iliac crest graft, all for C5-6 and C6-7. The claimant's incisions were good and the staples were removed on December 11, 2002. The claimant was then referred for physical therapy. On May 1, 2003, a cervical spine x-ray revealed stable appearance and fusion from C5 to C7 with stabilization hardware. Dr. Kennedy recommended chiropractic adjustments on May 29, 2003. On July 1, 2003, Dr. Kennedy reported Freeman had excellent range of motion and normal strength, but with ongoing pain. She was to be seen on an as needed basis and was allowed to work without restrictions.

Freeman was examined by Shawn L. Berkin D.O. on October 13, 2003 for an independent medical evaluation of her November 2000 injury. At the evaluation, Freeman indicated that she had pain and tenderness in her neck and left arm, that she used a TENS unit to control her symptoms, that muscle spasms in her neck would disrupt her sleep, and that numbness and pain specifically affected

her when lifting, washing dishes, and driving her car. Dr. Berkin diagnosed her with various afflictions affecting her C5 to C7 intervertebral disks and opined she had a permanent partial disability of 55% of the body. Dr. Berkin recommended a 35 pound lifting restriction from the level of the waist to the chest as a single event and a 25 pound lifting restriction on an occasional basis. He recommended that Freeman avoid lifting or working with her arms above her shoulders, sitting with her neck in a fixed position for an extended period of time, and rapid movement of her head and neck. If required to perform high exertion activities, she should be permitted frequent breaks to avoid exacerbation of her symptoms or further injury.

Freeman saw Douglas Parashak, M.D. on March 11, 2004. At this time, she had complaints of stress and anxiety. She denied headaches and her neck was supple with a full range of motion. Dr. Parashak generally discussed anxiety with the claimant and gave a prescription for pain medication for sleep at the patient's request.

On April 18, 2004, Dr. Berkin re-examined the claimant. At this time, the claimant indicated that since her surgery she has experienced persistent pain in her lower back at the site of her bone graft. There was tenderness over the left buttock over the donor site scar. The scar itself was soft and well-healed with out swelling or inflammation. Range of motion of the lumbar spine was normal in all planes of movement. There was no tenderness in her legs or thighs and Freeman was able to

elevate on her toes and heels without difficulty. The accident in November 2000 was found to be a substantial factor in causing the chronic symptoms over the donor site scar.

Freeman returned to Dr. Parashak on June 24, 2004 with increased panic attacks and chronic neck pain. Her panic attacks were developing into a more significant form of depression and she was reportedly fired from her job because of difficulty concentrating. Her neurological examination was still intact and no physical symptoms with her back or neck were indicated. The claimant was to start a formalized pain management treatment on July 7, 2004.

In July of 2004 Freeman returned to see Dr. Graham, whom she has last seen in June 2002. Dr. Graham instructed her to start a home exercise program, but she stated she was too busy to follow through on a regular basis. Office notes indicate that Freeman worked as a legal secretary at this time and that she walked during lunch. Dr. Graham began a series of trigger point injections and prescribed physical therapy. Dr. Graham also recommended regular stretching and exercise. In an August 9, 2004 note to Dr. Kennedy, Dr. Graham reported that Freeman was feeling better and that her pain was reduced. She had been active in physical therapy and significant improvement in her condition had been noted. Her range of motion was excellent and no spasm or trigger points were detected. Dr. Graham indicated that she was reaching maximum medical improvement.

Although Freeman's alleged onset date is November 30, 2004, there are no records of medical treatment between August of 2004 and November 2005.

On November 4, 2005, Freeman saw Dr. Parashak with complaints of headache, dizziness, and body aches for the past week. She complained predominately of maxillary pain. Her neck was supple with full rain of motion, her lungs were clear and, and her neurological examination was intact. Dr. Parashak's impression was sinusitis.

On February 6, 2006, Freeman saw Thomas Davant Johns, Ph.D. for a psychological examination alleging neck and back problems as well as anxiety and depression. Dr. Johns diagnosed a mild depressive disorder, a panic disorder without agoraphobia, and a pain disorder associated with psychological factors and her general medical condition. Dr. Johns found the claimant would be markedly impaired in her ability to complete simple tasks in a timely manner over a sustained period of time without interruption by symptoms of chronic pain, depression, and/or anxiety.

On March 29, 2006, Dr. Parashak issued a statement that the claimant had chronic pain and was unable to sit for prolonged periods of time. Dr. Parashak issued this statement to suggest that the claimant should be excused from jury duty.

On April 13, 2006, the claimant returned to Dr. Kennedy with complaints of

intermittent numbness in both arms and hands. This numbness particularly bothered the claimant at night or while driving. The claimant's range of motion was fairly good, she was alert and fully oriented, her reflexes were brisk, and she showed normal tone and bulk throughout. Dr. Kennedy noted interbody fusion between C5-6 and C6-7. Minimal disc bulging was present at C3-4 and C4-5.

On June 7, 2006, Freeman was seen for a new patient visit by Rachel A. Feinberg, M.D. Freeman reported lowback and neck pain. Dr. Feinberg found that she was compressed and rotated in the thoracic spine. The treatment recommendation was physical therapy including myofascial release, muscle energy, neuromobilization, and mobilization of the spine. There is no indication that the claimant pursued physical therapy and there are no further records from Dr. Feinberg.

On April 20, 2007, Freeman saw Dr. Parashak primarily for irritation of the tongue. The tongue was unremarkable except for a mild white coating. The claimant had no difficulty swallowing. The claimant reported no headaches, lightheadedness, dizziness, fevers, chills, cough, wheezing, shortness of breath, abdominal pain, nausea, vomiting, radicular back pain, or change in bowel or bladder function. Her neck was supple with full range of motion and her neurological examination was unremarkable.

On April 20, 2007, Dr. Parashak completed a Physician's Assessment for

Social Security Disability Claim and reported that the claimant was unable to sustain greater than 8 hours of work due to muscle pain and stiffness. He noted that she also reported increased anxiety and chronic pain due to anxiety attacks at this time.

Freeman saw Cheryl Lankford, a licensed massage therapist, between June 2006 and April 2007. Lankford stated that the claimant had muscle deterioration due to scar tissue formed from her accident and surgery. Lankford suggest ongoing massage for release of scar tissue and trigger points.

**Legal Standard**

A court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the records as a whole. *Growell v. Apfel*, 2542 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id*., or because the court would have decided differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well

as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188, F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

1. the credibility findings made by the Administrative Law Judge;
2. the education, background, work, and age of the claimant;
3. the medical evidence from treating and consulting physicians;
4. the plaintiff's subjective complaints relating to exertional and non-exertional impairments;
5. any corroboration by third parties of the plaintiff's impairments; and
6. the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§404.1505(a) and 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant in engaging in substantial gainful activity, she is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled.

Third, if the claimant is found to have a severe impairment, the Commissioner then evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner then reviews whether the claimant can perform her past relevant work. If the claimant can perform her past relevant work, she is not disabled.

Fifth, if the claimant cannot perform her past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant is disabled. 20 C.F.R. §§ 404.1520 and 416.920.

When evaluating evidence of subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by

objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See*, *e.g.*, *Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id*. at 1322.

### The ALJ's Findings

After hearing Freeman's testimony at the hearing, the ALJ called a Vocational Expert, Brenda Young. In response to hypothetical questions, the Vocational Expert opined that although Freeman could not perform her past relevant work because of her lifting restrictions, there were substantial numbers of jobs that Freeman could perform. In response to a hypothetical question posed by Freeman's counsel, the vocational expert agreed that these jobs would not be available if the ALJ believed Dr. John's testimony that Freeman could not complete even simple tasks over a substantial period of time.

The ALJ found that Freeman did not suffer from a disability within the meaning of the Social Security Act at any time through the date of the decision. He issued the following specific findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.
>
> 2. The claimant has not engaged in substantial gainful activity since November 30, 2004, the alleged onset date. (20 C.F.R. 404.1520(b) and 404.1571 *et seq.*).
>
> 3. The claimant has the severe impairments of degenerative disc disease of the spine, a depressive disorder and an anxiety disorder (20 C.F.R. § 404.1520©)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift 10 pounds occasionally and less than 10 pounds frequently. She requires a sit/stand option. She can occasionally climb stairs, and ramps, but never ropes, ladders and scaffolds. She can occasionally balance, occasionally stoop, occasionally crouch, occasionally kneel, and occasionally crawl. She should avoid concentrated exposure to hazards of unprotected heights. In addition, she can understand, remember, and carry out at least simple instructions and non-detailed tasks. She can respond appropriately to supervisors and co-workers and can work in contact with the public.
>
> 6. The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).
>
> 7. The claimant was born on December 31, 1960 and was 43 years old, which is defined as a younger individual aged 18-44, on the

alleged disability onset date (20 C.F.R. § 404.1563). The claimant is now age 46, which is defined as a younger individual.

8. The claimant has more than a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1560(c) and 404.1566).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 30, 2004 through the date of this decision (20 C.F.R. 404.1520(g)).

## Discussion

When reviewing a denial of Social Security benefits, a court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Rather, the court's task is a narrow one: to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). The answer to that question is yes.

Claimant argues that the Commissioner failed to file his answer within the 63 days as required by Fed. R. Civ. P. 6(d). Even assuming, arguendo, that the answer was filed three days late, a judgment on the pleadings is not appropriate here. There are material issues of fact and the claimant is not entitled to judgment as a matter of law. See *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 803 (8th Cir.2002). A default judgment is a drastic sanction that should only be employed in an extreme situation, especially in cases against the United States, its officers, or its agencies. See Fed. R. Civ. P. 55(d).

In her brief in support of her complaint, Freeman asserts that "it is patently obvious that the ALJ's findings, to the effect of the Plaintiff's subjective complaints of pain are not credible, are fallacious and not supported by the evidence in the records." Pl.'s Br. at 10. In determining subjective complaints of pain, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to: 1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) any precipitation or aggravating factors; 4) the dosage effectiveness and side effects of medication; and 5) any functional restrictions. *Polasiki v. Heckler*, 739 F.2d 1320 (8th Cir.1984). After considering such factors, the ALJ may discredit subjective complaints of pain if there are inconsistencies in the evidence as a whole. *Id*.

The ALJ noted that while "the claimant's medically determinable

impairments could reasonably be expected to produce some of the alleged symptoms . . . that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." In making this determination, the ALJ considered the claimant's work history, her medication, the claimant's subjective complaints of pain, and the objective medical records. Central to the ALJ's determination was 1) the lack of consistent or current medical treatment; 2) the 13 month lapse between the alleged disability onset date and the filing of the disability benefits application; and 3) the lack of limitations placed on the claimant her treating and examining physicians (Dr. Graham, Dr. Faber, Dr. Young, Dr. Petkovich, Dr. Kennedy, Dr. Feinberg, and Dr. Pashak). The ALJ has adequately considered the claimant's subjective complaints for pain and supported his conclusion with substantial evidence on the record.

Freeman next argues that the ALJ failed to consider the combined effect of all of her impairments. Specifically, she argues that the ALJ failed to take into account "the effect of [her] psychological impairments as they are combined with her physical impairments." Pl.'s Br. at 11. Freeman bases this argument on the two hypotheticals posed to the vocational expert by the ALJ. Tr. 45-47. Freeman claims that these hypotheticals did not account for the psychological impairments as diagnosed by Dr. Johns. The vocational expert opined that if Freeman could not even complete even simple tasks, then she would be disabled.

When the claimant suffers from nonexertional impairments that effect residual capacity, testimony of a vocational expert is required to determine what work a person with the claimant's impairments may perform. Hypotheticals posed to a vocational expert must include all physical and mental impairments the ALJ finds to be credible. *House v. Shalala*, 34 F.3d 691, 694 (8th Cir. 1994).

The ALJ gave less weight to Dr. Johns' testimony as there was little objective evidence that the claimant would be markedly impaired in her ability to complete simple tasks in a timely manner over a sustained period of time. The ALJ adequately explained his reasoning for discounting Dr. Johns' opinion. The Claimant has not sought any other psychological treatment or opinions regarding her "depressive disorder" as diagnosed by Dr. Johns. Because the ALJ provided a reasoned basis for his discounting of Dr. Johns' opinion, he was not required to include those limitations in his questions to the vocational expert.

Thus, the ALJ properly posed hypotheticals to the vocational expert and adequately considered the combined effects of all of the claimant's impairments that the ALJ found credible. The Commissioner, therefore, met his burden of proving that the claimant was capable of performing other jobs in the national economy that are consistent with her medically determinable impairments, age, education, and work experience.

## Conclusion

For the aforementioned reasons, the ALJ's determination that Freeman was not disabled is supported by substantial evidence in the record as a whole. The decision should therefore be upheld.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed. A separate judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 5th day of January, 2010.